## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 2:09cv034

LYNN B. MATHIS,                          )
                                         )
                    Plaintiff,           )
                                         )        **MEMORANDUM OF**
            vs.                          )        **DECISION AND ORDER**
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )
                                         )
_____         )


**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 9] and the Defendant's Motion for Judgment on

the Pleadings [Doc. 11].

## I.    PROCEDURAL HISTORY

The Plaintiff Lynn Mathis protectively filed an application for a period

of disability and disability insurance benefits, along with Supplemental

Security Income benefits, on March 14, 2006, alleging that she had

become disabled as of October 3, 2005.  [Transcript ("T.") 108-110].  The

Plaintiff alleges that she was disabled by severe pain, occasional inability

to walk, irritable bowel disease, sleep apnea, fibromyalgia, depression,

anxiety, and vision problems.  [Doc. 10 at 2-3].

The Plaintiff's application was denied initially and on reconsideration. [T. 84-91, 93-99].  A hearing was held before Administrative Law Judge ("ALJ") Ivar Avots on September 25, 2008.  [T. 23-69].  On December 30, 2008, the ALJ issued a decision denying the Plaintiff benefits.  [T. 10-20]. The Appeals Council accepted additional evidence, then denied the Plaintiff's request for review,  thereby making the ALJ's decision the final decision of the Commissioner.  [T. 1-4].  The Plaintiff has exhausted her available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall

be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Smith v. Heckler</u>, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. <u>Hays</u>, 907 F.2d at 1456; <u>Lester v. Schweiker</u>, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does

not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was 44 years old at the time of the ALJ's hearing. She has a high school education in that she obtained her GED. [T. 26]. The Plaintiff lives with her mother and 13-year-old son and is on Medicaid. She has not worked since October 3, 2005, when she lost the ability to bear weight on her right side. Her past relevant work was as a shirt presser,

4

which involved standing all day and pressing up to 200 shirts per day [T. 29-30], and as a medical technician, which involved administering pills and shots to retirement home patients, as well as assisting with patient transfers [T. 31-2].

Treatment notes contained in the record indicate that the Plaintiff was seen by R. Scot Nixon, M.D. from January 9, 2006 through May 9, 2006, and from August 15, 2006 through October 1, 2007, for a variety of problems, including sleep apnea, depression and anxiety, fibromyalgia, gastrointestinal problems, and a history of endometriosis. [T. 211-216, 246-8, 302-327]. On November 30, 2006, Dr. Nixon provided the Plaintiff with an opinion of disability. Dr. Nixon's opinion, however, identifies no limitations resulting from her impairments other than fatigue. His records from that day further reflect his observation that the Plaintiff was walking normally. [T. 309]. During the course of his treatment, Dr. Nixon accepted Plaintiff's report that she was in treatment with a psychologist [T. 310, 312, 313, 315,], fielded her requests for and cautioned her against misuse of narcotics and addictive psychotropic medications [T. 312, 314], changed her psychotropic drugs at virtually every visit, and noted the absence of and only minimal objective findings for various physical complaints that prompted her visits.

A Psychiatric Review Technique (PRT) was performed on May 2, 2006 by Eleanor E. Cruise, Ph.D. [T. 221-234]. Dr. Cruise found moderate limitations in Plaintiff's concentration, persistence or pace. Dr. Cruise then performed a mental Residual Functional Capacity (RFC) Assessment for Disability Determination Services (DDS). [T. 217-220]. She found no marked limitations, and concluded that Plaintiff was capable of simple routine repetitive tasks. This conclusion was affirmed by Robert A. Johnson, Ph.D. on August 9, 2006. [T. 285].

On admission to treatment at Smoky Mountain Center in April 2006, Plaintiff had a Global Assessment of Functioning (GAF) score of 45 and was diagnosed with "major depression, single." She complained that her pain medications were not working, that pain made her depressed and that her quality of life had decreased. She denied any suicidality. [T. 297-301].

On May 2, 2006, Philomena Krasinski performed a physical RFC on the Plaintiff for DDS. [T. 235-242]. She found Plaintiff to have the residual capacity to perform medium work. Ms. Krasinski's credentials for offering this opinion are not in the record. [T. 242]. Ms. Krasinski's RFC opinion, however, was confirmed by Charles A. Burkhart, M.D. on August 2, 2006, who cited several subsequent medical notes in support of his agreement therewith. [T. 278].

On August 4, 2006, Michael R. Penland, Ph.D. performed a psychological evaluation upon the Plaintiff.   His diagnostic impressions were that she had major depressive disorder, single episode, moderate generalized anxiety disorder, and panic disorder without agoraphobia.  He noted a GAF score of 40.  This was based on his observation that she was able to relate to others including coworkers and supervisors, to understand, retain and follow instructions, and sustain attention to simple repetitive tasks.  [T. 279-283].

On October 5, 2006, Plaintiff was seen at Westcare Emergency Room after a suicide attempt in which she ingested up to18 or 19 Darvon pills.   She reported that she had swallowed the pills on impulse and immediately regretted it.  She obtained transportation to the hospital and was purged within 45 minutes of taking them.  She was described as having no overt hallucinations or delusions, fair to poor concentration and memory, depressed affect, and fair insight.  She was admitted for further treatment.  [T. 333-36].

A record of Brandy Hicks, O.D. dated September 15, 2008 indicated that Plaintiff was under glaucoma treatment since August 7, 2008.  Dr. Hicks noted that Plaintiff suffered from vitreous floaters in both eyes, and that her best corrected vision was 20/25 in each eye.  [T. 329].

On March 4, 2009, Karen Marcus, Psy.D. performed a psychological evaluation of the Plaintiff.  [T. 337-351].  She performed a battery of tests and provided a Medical Assessment of Ability to Sustain Work-Related Activities (Mental).  [T. 350-51].  Dr. Marcus noted that Plaintiff appeared tired and weary, was tearful, had tangential thinking, and displayed an "almost 'manic' abandonment of embarrassment" in her responses.  IQ testing resulted in Borderline Range scores. [T.342].  Dr. Marcus' diagnostic impressions were bipolar disorder, NOS ["not otherwise specified"]; posttraumatic stress disorder; undifferentiated somatization disorder; personality disorder NOS, and a GAF of 44. [T.349].  Her Medical Assessment of Ability to Sustain Work-Related (Mental) activities showed significant limitations in all 15 measured areas except maintaining personal appearance. [T.350-51].

At the hearing before the ALJ, Plaintiff testified that her worst problems were severe pain and being "unable to walk lots of times."  She testified that she also has glaucoma and vision "floaters," as well as sensitivity to light.  [T. 34].  She further testified that she cannot see to read "very well at all" and could not read a magazine "for very long," although she stated that she could read a prescription bottle.  [T. 42-3].  Plaintiff testified that she wears bifocals for vision and sunglasses due to her

photosensitivity.  [T. 44-5].  She reported that she cannot view a full movie without encountering visual problems.  [T. 54].

Plaintiff reported using a cane for an entire year after her last day of work.  [T. 36].  She currently uses no assistive device.  [T. 52].   She testified that she can stand without pain only for 15 minutes at a time.  [T. 36].  With respect to activities of daily living, Plaintiff testified that she could fix a sandwich and do light housework with breaks.  She reported that her mother does most of the cooking.  [T. 46].  She further reported that she did not mop or vacuum because twisting aggravated her.  [T. 37].  Plaintiff testified that housework aggravated her fibromyalgia.  [T. 38].  Plaintiff reported that she shops once or twice a week and uses the cart to hold herself up while she shops.  She testified that she manages her own medications and medical care.  [T. 47].  Plaintiff testified that she goes to church twice a month, and that church is her social outlet.  [T. 50].

Plaintiff testified that she uses Darvon for pain, although the medication makes her drowsy.  [T. 38].  She rated her pain at a 7 on a scale of one to ten.  She reported that Darvon only diminished the pain to a 4 out of 10.  [T. 51].  Plaintiff stated that heat and prayer were additional sources for helping her pain.  She reported having made suicide attempts because of her pain.  [T. 38-9].  During the periods when she was eligible

for Medicaid, she received mental health counseling. [T. 41]. Plaintiff testified that she takes Klonopin for manic depressive disorder. [T. 39]. She reported that anti-depressants cause adverse reactions and make her worse. Other side effects from her medications include blurred vision and dizziness, which Plaintiff stated could be relieved by lying on her left side for 10-15 minutes. [T. 40].

Plaintiff's mother testified that Plaintiff is not able to do much, and that any physical efforts led to "jerking and hurting ... and crying." [T. 56]. She reported that Plaintiff could sometimes fix her own cereal, but that she cannot move furniture or vacuum. [T. 57]. She further stated that she takes Plaintiff out to fast food restaurants about twice a month and to church weekly. [T. 61]. Plaintiff's mother noted that mental health medications seem to help her daughter's condition. [T. 58].

Dr. Roy Sumter was sworn to testify as a vocational expert. He classified her past work. [T. 63-6]. Given a hypothetical question assuming a capacity for medium work limited to simple routine repetitive tasks, he testified she could do her past work as presser and the factory work. [T. 67]. He reconciled his answers with the Dictionary of Occupational Titles (DOT). [T. 68].

## V. THE ALJ'S DECISION

On December 30, 2008, the ALJ issued a decision denying the Plaintiff's claim. [T. 10-20]. Proceeding to the sequential evaluation, the ALJ found a date last insured of December 31, 2010 and that the Plaintiff had not engaged in any substantial gainful activity since October 3, 2005. [T. 12]. The ALJ then determined the following severe impairments: mild bilateral facet arthropathy at L2-3 and L3-4, sleep apnea, depression and anxiety, fibromyalgia, esophagitis, and gastritis. [T. 12]. The ALJ concluded, however, that her impairments did not meet or equal a listing. [T. 16]. He then determined that Plaintiff retained the residual functional capacity (RFC) to perform medium work and was limited to simple, routine, repetitive tasks. [T. 17]. He found that Plaintiff could perform her past relevant work as factory worker and presser. [T. 19]. Accordingly, he concluded that the Plaintiff was not disabled since October 3, 2005. [T. 19].

## VI. DISCUSSION

Plaintiff argues that the ALJ failed to properly evaluate her medical opinion evidence and failed to properly evaluate her pain and symptoms.

### A. The ALJ properly evaluated Plaintiff's medical opinion evidence, and his findings were supported by substantial evidence.

Regulations dictate the ALJ's process for evaluating medical source

11

evidence:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion: (1) Examining relationship; (2) Treatment relationship; (i) Length of the treatment relationship and the frequency of examination.(ii) Nature and extent of the treatment relationship.

20 C.F.R. § 404.1527(d).

Medical source evidence is evaluated at step four as part of the assessment of residual functional capacity (RFC). The RFC is comprised of findings about Plaintiff's capacity to perform physical and mental work functions. SSR 96-8p. Plaintiff bears the burden of proof to show limitations on her capacity to perform those functions.

The RFC must be based on some accepted medical source. In assessing a claimant's RFC, the ALJ "may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir.2002); see also Jackson v. Astrue, 2010 WL 500449, at *7 (D.S.C. 2010).

In assessing her RFC, the Plaintiff asserts that the ALJ erred by

discounting Dr. Nixon's November 30, 2006 disability opinion.  [T. 308].

The ALJ discussed Dr. Nixon's opinion [T. 14-5, 18] but refused to grant it

controlling weight, citing inconsistencies between it and Dr. Nixon's own

treatment records and observations.  [T. 18].  There is substantial evidence

to support the ALJ's decision in this regard.

As noted by the ALJ, Dr. Nixon's treatment notes indicate that

Plaintiff experienced  "improvement in anxiety/depression with medication."

[T. 18].  On the date the disability opinion was written, his treatment notes

indicate she was "walking regularly."  [T. 309].  Neither of these

observations is consistent with Dr. Nixon's conclusion that Plaintiff is

disabled.   Moreover, Dr. Nixon's five-sentence opinion was rendered after

just seven visits with the Plaintiff; such a relatively short treating period

supports the ALJ's discounting Dr. Nixon's opinion that Plaintiff was

disabled.  See 20 C.F.R. § 404.1527(d)(2)(i).  [T. 211-216, 309-318].

Furthermore, Dr. Nixon's opinion does not identify any specific

limitations, other than decreased stamina, which resulted from Plaintiff's

impairments.  A limitation of decreased stamina, without more, does not

support a conclusion that Plaintiff is unable to work.  In any event, no

objective clinical findings confirming decreased stamina were noted in the

opinion.  Even in the absence of the inconsistencies discussed above, an

opinion that does not state limitations is of little or no evidentiary value for its intended purpose of demonstrating a claimant's RFC.  As the ALJ noted [T. 18], these deficiencies reduce Dr. Nixon's opinion to a mere advocacy opinion.  See House v. Astrue, 500 F.3d 741 (8th Cir. 2007); Coggon v. Barnhart, 354 F.Supp.2d 40 (D.Mass. 2005).  Advocacy opinions impermissibly invade the exclusive province of the Commissioner to decide the ultimate issue of disability.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).   Accordingly, the Court concludes that the ALJ was correct in attributing no weight to Dr. Nixon's opinion.

Next, Plaintiff asserts that the ALJ erred by assigning little weight to Dr. Penland's opinion regarding Plaintiff's capacity for mental work functions.  Specifically, she argues that the ALJ impermissibly substituted his own lay opinion about the GAF score that Dr. Penland found.  Further, she argues that the weight of Dr. Penland's opinion is necessarily enhanced by its consistency with the record and with Dr. Marcus' post-hearing evaluation and opinion.  She argues that the regulations connote greater weight to the opinions of these two doctors as specialists and one-time examining consultants.

The ALJ did not err in his evaluation of Dr. Penland's opinion.  In his evaluation, the ALJ discussed Dr. Penland's major findings, including the

14

GAF score of 40. [T. 14]. In his step two and step four evaluations, the ALJ recited numerous instances from the longitudinal record of functioning at levels higher than those noted by Dr. Penland in his one encounter with the Plaintiff, in the areas measured by "B" criteria. [T. 13-15, 18-19]. He also recited an instance where Plaintiff inflated reports of mental symptoms with the objective of getting prescriptions for narcotic medications;[1] when inpatient mental health treatment was recommended as more appropriate, she recanted her symptoms. [T. 13]. He further noted that while Plaintiff testified that she had received mental health counseling and had been diagnosed with mental problems, the record did not contain any evidence of such counseling or a diagnosis emanating from a treating relationship with any counselor. [T. 15]. These findings support the ALJ's step three findings as to the "B" and "C" criteria [T. 16-17], as well as his step four findings that Dr. Penland's opinion had no support in the record.

Plaintiff's addition of Dr. Marcus' relatively consistent evidence after the hearing, while reviewable by this Court,[2] does not strengthen the evidentiary value of Dr. Penland's opinion. Like Dr. Penland, Dr. Marcus

---

[1]Drug seeking behavior was also noted in Dr. White's records. [T. 202].

[2]Wilkins v. Sec'y, Dep't of Health and Human Svcs., 953 F.2d 93 n.4 (4th Cir. 1991).

was a one-time evaluator, who relied heavily on Plaintiff's subjective claims. Dr. Marcus' opinion does not change the longitudinal record featuring a near-total absence of mental health treatment and demonstrating only mild limitations, and Plaintiff does not suggest that it does. The regulations for weighing medical source evidence do not require a different conclusion. <u>See</u> 20 C.F.R. § 404.1527(d). As such, the Appeals Council did not err in affirming the ALJ's decision in spite of its receipt of Dr. Marcus' opinion.

Plaintiff is correct that the ALJ erred in stating that "a GAF of 40 indicates impaired reality testing or communication, and would reflect an individual who is likely hospitalized" [T. 19], as that is not supported by the DSM-IV. <u>See</u> <u>Diagnostic and Statistical Manual of Mental Disorders</u>, DSM-IV-TR 32-34. This inaccuracy, however, when read in context, appears to have been an aside rather than the basis for the ALJ's rejection of Dr. Penland's opinion. As such, it is a mere technical error "minor enough not to undermine confidence in the determination of [the] case." <u>Gay v. Sullivan</u>, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993). In any event, this inaccuracy is rendered harmless by the fact that in rejecting Dr. Penland's opinion, the ALJ primarily relied upon the absence of any evidence in the longitudinal record of any greater limitations than what was

found by the ALJ.  Plaintiff's brief does not point to any such evidence outside of Drs. Penland and Marcus' reports.

In sum, the Court concludes that the ALJ's evaluation of medical source evidence complied with the applicable regulations, and that substantial evidence supports his findings regarding Plaintiff's mental impairments and related limitations.

**B.    The ALJ's assessment of Plaintiff's pain and symptoms followed applicable law and was supported by substantial evidence.**

Next, Plaintiff argues that the ALJ improperly evaluated her complaints of pain and symptoms from irritable bowel disease, sleep apnea, depression and anxiety.  [Doc. 10 at 26].  Specifically, she asserts that he required objective medical findings supporting her allegations of pain and symptoms, contrary to the regulations governing the assessment of pain and symptoms.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process.  "First, there must be objective medical evidence showing the existence of a medical impairment(s) . . .which could reasonably be expected to produce the pain or other symptoms alleged."  <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir.1996).  If there is such evidence, then the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it

affects his ability to work." Id. at 595. Specific factors to be evaluated

include daily activities; the location, duration, frequency, and intensity of

pain or other symptoms; precipitating and aggravating factors; the type,

dosage, effectiveness, and side effects of any medication taken to alleviate

pain or other symptoms; and other treatment and measures taken for relief

of pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i-vi).

The Plaintiff's argument is belied by the ALJ's opinion. Having found

that Plaintiff has severe conditions that could be expected to cause pain,

the ALJ went on to discuss the testimony offered by Plaintiff and her

mother relating to symptoms, their duration, frequency and intensity, and

the efficacy of treatment. [T. 15-16, 18]. In so doing, the ALJ considered

Plaintiff's evidence of the subjective experience of pain as well as the

objective medical evidence. Plaintiff suggests that the ALJ improperly held

against her an *absence* of corroborative objective medical findings. This is

incorrect. The ALJ noted the *presence* of "largely normal objective

findings" that contradict Plaintiff's subjective claims of pain and symptoms,

and there are no objective findings in the record to support Plaintiff's

position.

In the absence of such objective findings Plaintiff must be able to

prove her pain through other credible evidence. The ALJ noted there were,

however, several inconsistencies in Plaintiff's evidence pertaining to her claims of pain. These were noted by the ALJ in his opinion, including the inconsistencies between Plaintiff's testimony and her medical records, and even between her testimony and the testimony of her mother. These discrepancies fairly and significantly support the ALJ's adverse credibility findings. [T. 18-19]. He also noted her non-compliance with medical treatment. "In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief...." McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D.Kan. 1999)(citing Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991)).

Plaintiff argues that her pain evidence was not limited to her subjective complaints and cites to the opinions of Drs. Penland and White. Dr. Penland's opinion, however, was based solely on a single examination of Plaintiff and relied on her subjective complaints. Dr. White expressed doubt as to Plaintiff's veracity in her subjective complaints. [See, T.202]. As such, these opinions do not provide Plaintiff with anything more than her subjective complaints to support her claims of pain and other non-exertional symptoms.

"Although a claimant's allegations about her pain may not be

discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Craig, 76 F.3d at 595.

The ALJ's evaluation of the pain evidence was proper. Though he relied on the objective medical evidence, he did not rely on it solely. He also evaluated the Plaintiff's credibility in order to assess her subjective claims of pain. He concluded his evaluation with a return to the first step of the two-step evaluation of pain and symptoms, noting that while he did find at step two that fibromyalgia was a severe impairment, the finding was "generous" due to the weakness of the evidence that fibromyalgia had been diagnosed. [T. 19]. This assessment of the evidence of the diagnosis is amply supported by the record.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Therefore, the Court finds that the ALJ's analysis of pain and symptoms followed applicable law and was supported by

substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied

the correct legal standards, and that there is substantial evidence to

support the ALJ's finding of no disability through the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's

Motion for Judgment on the Pleadings [Doc. 11] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary

Judgment [Doc. 9] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: August 11, 2011

Martin Reidinger
United States District Judge